UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

| | |
|---|---|
| KEVIN A. McREYNOLDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 06-cv-2005 |
| v. ) | |
| ) | |
| ORVILLE "PUNCH" MARTIN, in his ) | Hon. Harold A. Baker, |
| individual capacity and in his official ) | Judge Presiding |
| capacity as Marrowbone Township ) | |
| Highway Commissioner, ) | |
| ) | |
| Defendant. ) | |

ORDER

On January 13, 2006, the plaintiff, Kevin A. McReynolds ("McReynolds") brought this suit under 42 U.S.C. § 1983 against Orville "Punch" Martin ("Martin") in his individual capacity and in his official capacity as the Marrowbone Township Highway Commissioner ("Commissioner"). McReynolds alleges that he was fired from the Marrowbone Township Highway Commission ("Commission") on the basis of political affiliation in violation of his First Amendment rights, made application to state action under the Fourteenth Amendment.

Martin has moved for summary judgment. For the following reasons, his motion is granted.

I. Background

The Commission is a two-person operation consisting of the Commissioner and one full-time employee.[1] The Commissioner is elected every four years under Illinois law, 605 ILCS 5/6-116, and has general charge of the roads in his district. *See* 605 ILCS 5/6-201 *et seq*. The employee is unelected and has no official title or written job description. From 1989 until May 2005, McReynolds' father, Robert Arthur McReynolds, served as the Commissioner. From 1994 until May 2005, McReynolds worked for his father as the Commission's full-time employee. During that time, his duties consisted of manual labor such as maintaining and repairing roads.

Commissioner McReynolds announced that he would retire in April or May 2005, and

---

[1] On occasion, the Commission will hire part-time employees to supplement the two-person staff.

McReynolds hoped to succeed his father as Commissioner.  He campaigned unsuccessfully against Martin for the Republican nomination.  Following defeat in the Republican caucus, McReynolds procured enough signatures to run against Martin as an independent candidate in the April 5 general election.  Martin defeated McReynolds again in the general election and took office on May 2.

Shortly after the election, Martin approached McReynolds to say he would not need McReynolds after he became Commissioner.  McReynolds, suspecting he had been fired, requested written confirmation.  In a letter of April 21, Martin formally terminated McReynolds' employment with the Commission, effective May 2.  One week after taking office, Martin hired his friend David Gillmore to fill McReynolds' former post.  Martin verbally authorized Gillmore to speak for the Commissioner at public events, make emergency decisions, order parts, repair equipment, and access Commission files.

The plaintiff filed the present action in January 2006, arguing that the First Amendment protected him, as a non-policymaking laborer, from political discharge.  He seeks reinstatement, back pay, compensatory damages, attorney's fees, and punitive damages.

In his summary judgment motion, Martin argues that government officials may fire employees for whom political loyalty is an appropriate job qualification, and that McReynolds held such a job.[2]  Alternatively, as an elected official, Martin claims he is entitled to qualified immunity from suit because the law did not clearly establish at the time that dismissing McReynolds for political reasons would violate the law.

## II.  Discussion

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if it will "affect th[e] outcome of the suit . . . ."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence about the fact is such that "a reasonable jury could return a verdict in favor of the nonmoving party."  *Anderson*, 477 U.S. at 248.  To prevail, the moving party must show "an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  To prevent summary judgment, the nonmoving party must show the existence of a genuine dispute of material fact. *Anderson*, 477 U.S. at 248.  When evaluating the evidence, courts must draw "all reasonable inferences in favor of the nonmovant."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000).

For the purpose of this motion, the court assumes that political affiliation was a basis for Martin's firing McReynolds.  *See supra* note 2.  That leaves the single question whether

---

[2]Martin "denies that the failure to retain Plaintiff is related in any way to political affiliation.  However, for purposes of this motion, the Defendant will assume for the sake of argument that political affiliation was a basis for termination."

2

McReynolds' former position requires political affiliation, and is therefore subject to patronage dismissal without infringement of his constitutional rights.

The First Amendment protects public employees from discharge on the basis of "political affiliation unless the nature of [the] job makes political loyalty a valid qualification." *Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005); *see also Branti v. Finkel*, 445 U.S. 507, 518 (1980); *Elrod v. Burns*, 427 U.S. 347, 372 (1976). The reason for this exception to freedom of speech is that "[y]ou cannot run a government with officials who are forced to keep political enemies" in key and trusted positions. *Soderbeck v. Burnett County,* 752 F.2d 285, 288 (7th Cir. 1985). In other words, the exception minimizes the "adverse impact on the effective functioning of government." *Soderbeck*, 752 F.2d at 288. The Supreme Court in *Branti* stated the test: any employee may be fired if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518.

The vast majority of legitimate patronage dismissals under *Branti* involve "policymaking" and "confidential" positions. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005). An office involves policymaking if it authorizes "meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Kiddy-Brown*, 408 F.3d at 355. "Confidential" is a catchall designation for "government employees who, while not decision makers, are in close contact with policymakers " and their records, and for whom "political antipathy can serve as a decent proxy for a lack of trust and loyalty." *Meeks v. Grimes*, 779 F.2d 417, 420 (7th Cir. 1985).

Typically, whether a position requires political affiliation is a question of fact for a jury. *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999). Other times, the scope of a job is so clear that the court can determine, as a matter of law, whether a job requires political loyalty. *Pleva*, 195 F.3d at 912. Courts looks to the inherent nature of an office, rather than the actions of an individual officeholder.[3] *Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006) (*citing Riley*, 425 F.3d at 360-61). The official job description is important, though not dispositive, in determining the responsibilities inherent in a certain position. *Moss v. Martin*, 473 F.3d 694, 699 (7th Cir. 2007).

There is no written description for McReynolds' job. Therefore, the court must turn to the evidence to clarify the nature of the job to see if the undisputed facts are dispositive in light of the standards of summary judgment.

---

[3]This is because the line between professional and policy judgment is often blurred, and similar titles can "denote quite different levels of responsibility" in different contexts. *Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006). To base the distinction on acts rather than inherent powers of the office also would require courts and each new administration to conduct protracted re-examinations of each "position every time a new administration changes the mix of responsibilities . . . ." *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir. 1985).

Martin argues that the Commission employee engages in policymaking. He suggests that the scope of authority he granted Gillmore includes some policymaking, and is indicative of the position's inherent powers. On the other hand, the record shows that McReynolds was primarily a manual laborer, and that Martin had a "general impression" of McReynolds' duties when he hired Gillmore as a replacement. Martin also admits to having "reformed the position" after he took office and fired McReynolds. McReynolds stresses that the absence of a formal title or written job description indicates there were no inherent duties other than the menial tasks he performed. Taken in a light most favorable to the plaintiff, the evidence reveals too little to discern whether the Commission employee has any inherent policymaking capabilities. Without more evidence, the absence of a written description makes it impossible to categorize McReynolds' job, as a matter of law, as inherently policymaking or non-policymaking.

Martin contends that even if the position does not have inherent policymaking functions, it nonetheless requires political affiliation to be effective. He is correct, but not for the reason he submits. He reasons that Gillmore's authority to appear publicly on behalf of the Commission projects both Martin's competence as well as the competence of the Commission. This requires Gillmore, says Martin, to ably articulate party views and political rationale as they relate to Commission grand strategy. This is an interesting theory, but falls short without evidence that Gillmore–or, for that matter, Martin himself or even previous Commissioners–ever appeared at a public function, intends to, or is required to.

There are, however, other relevant and uncontested facts. First, the Commission is a rural, two-person office responsible for approximately forty square miles. Second, Commission employees are in constant interaction. The depositions show that McReynolds had running contact with the Commissioner either by radio or phone or onsite during jobs, and that Martin and Gillmore also frequently communicate. Third, the parties were political rivals. Martin had recently defeated McReynolds at two consecutive stages in the campaign for Commissioner. After his election, Martin fired McReynolds, ostensibly for political reasons. Fourth, McReynolds stated in his deposition that when the Commissioner was out of the township or otherwise unavailable, constituents would call the office or "stop by the shed" to talk with McReynolds or to voice their concerns. On such occasions, McReynolds "told them I would inform the highway commissioner of their concerns. . . . [The Commissioner] was usually within radio range or I would call him on the telephone."

McReynolds' testimony is corroborated by the affidavit of John L. Wise, a former Commissioner, submitted by Martin in support of this motion: when the Commissioner is absent "his assistant would be responsible for making immediate decisions regarding the Township roads . . . ." This testimony is telling in two respects. First, it demonstrates that the Commissioner relies on the employee, even when the two are within radio distance, to relay important information from political constituents and, sometimes, to make immediate decisions. Second, the Commission's constituents consider the employee a reliable extension of the Commissioner.

The Seventh Circuit has addressed analogous situations. In *Soderbeck*, a newly elected

4

sheriff fired the previous sheriff's secretary, who was the wife of the unsuccessful incumbent. 752 F.2d 285. The sheriff's office in Burnett County, Wisconsin, had only six employees. Judge Posner observed that "[y]ou cannot run a government with officials who are forced to keep political enemies as their confidential secretaries . . . ." *Soderbeck*, 742 F.2d at 288 (finding, nonetheless, that a jury question existed as to whether political affiliation is a proper prerequisite for sheriff's secretary in six-person office).

*Meeks*, 779 F.2d 417, is also instructive. The newly elected city judge fired eight city court bailiffs who had opposed his campaign. The bailiffs sued and the district court judge ruled in favor of the defendant. On the plaintiffs' appeal, the Seventh Circuit articulated a "small-office exception" to First Amendment protection from patronage firings: "This situation arises in the context of the intimate working environment; it is here that a non-confidential, non-policymaking employee can work in such a close relationship with the elected official that animosity arising from political opposition can create an untenable job situation." *Meeks,* 779 F.2d at 422-23; *see also Matlock v. Barnes*, 932 F.2d 658, 665 (7th Cir. 1991) (recognizing the small office problem enunciated in *Meeks*). Small offices differ from the larger bureaucratic models envisaged in *Elrod* and *Branti*, prompting the court to "refuse[] to extend the protections of *Elrod* to these intimate settings" because it "would strain credulity to read the First Amendment or *Elrod* to require an elected official to work in constant direct contact with a person viewed as a political enemy." 779 F.2d at 422-23. (The case was remanded, however, to determine the exact nature of the work relationship between the judge and each bailiff. *Meeks*, 779 F.2d at 424.)

There are important congruencies between this case and *Meeks* and *Soderbeck*. This case, like the other two, involves political animosity in a tiny government office. And McReynolds, though not a secretary, performed a similar function to the secretary in *Soderbeck*. In both instances, the elected official relied on the non-policymaking employee to pass concerns, incidents, and other relevant information from constituents in order that the elected official could make informed and suitable policy choices. Unlike the sheriff in *Soderbeck*, the Commissioner would have also counted on his employee to perform much of the Commission's substantive work. Finally, because of the particular facts of this case, "confidential" is not the most accurate term for the work relationship between the employee and the Commissioner; rather, "reliance" is a more precise label, as the Commissioner requires loyalty and trust from his employee in order to make informed policy decisions and implement them effectively. Whatever the precise designation, the point is that the qualities necessary for the Commission's employee–loyalty, trust, reliability–mirror those required for a confidential position. In such close working conditions, as with a confidential employee, "political antipathy can serve as a decent proxy for a lack of trust and loyalty," *Meeks*, 779 F.2d at 420, making political loyalty a valid qualification for the Commission employee.[4]

---

[4] It is important to stress the limits of this reliance analysis. Reliance is common in government work settings. The *Branti* formulation, while broad, presumably has been read narrowly to prevent "machine politics" whereby an incoming official fires entire offices on the basis that political affiliation is a valid requirement for each position. To the extent that reliance expands on the generally accepted confidential analysis, it is limited here by the

5

This case also has important differences with *Meeks* and *Soderbeck*, which bolster Martin's case for summary judgment. First, the litigants here were the candidates. For this reason, the degree of political antipathy was potentially greater than the litigants in *Meeks* and *Soderbeck*, who were not themselves candidates, but relatives or supporters. Second, the court in *Meeks* remanded to determine the relationship between the judges and the bailiffs. Here, the close relationship is clear from the depositions–Commission employees have continuous and direct interaction. McReynolds maintained close contact with the Commissioner, as Martin and Gillmore do now. There is no reason to think that McReynolds would have needed any less contact with Commissioner Martin. Indeed, that is the only reasonable inference. Close cooperation is essential at the Commission–without it the Commission's ability to coordinate tasks and effectively care for such a large area is ruined.

If the *Meeks* exception applies in offices with more than two employees and to employees who are related or connected to candidates, then it must apply to a two-person office where the employee himself was a rival candidate. Under such conditions, it would be unreasonable to require Martin to reinstate McReynolds. Martin would be forced into a position of political vulnerability, required to place his trust in a political enemy both to convey important information and then to implement his policy decisions. There are no other employees at the Commission to report or otherwise check the employee's potentially subversive behavior or to mitigate the impact of such behavior. It is not enough that McReynolds declared himself willing to work for Martin, or that he has exhibited no hostility toward Martin, or that he considers both to be Republicans. Martin, not McReynolds, is the one who would bear all the political risk, as any covert action or omission by McReynolds would most harmfully reflect upon the Commissioner. As an elected official, Martin is entitled to reasonably organize his office in a manner that maximizes his ability to formulate and implement the necessary policies of his office and minimizes the risk of failing to achieve those goals. *See Stegmaier v. Trammell*, 597 F.2d 1027, 1038 (5th Cir. 1979).

One might argue that Martin could dismiss McReynolds for cause if such covert actions occur. As noted above, however, the Supreme Court has already determined that an elected official may fire any employee holding a position for which party affiliation is a valid qualification. *See Elrod*, 427 U.S. at 374-75; *Branti*, 445 U.S. at 518. McReynolds was in such a position. At any rate, dismissal for cause requires the elected official "to await discovery of covert action [that] may prove devastating to policy implementation by the new administration." *Stegmaier*, 597 F.2d at 1039 (*quoting* Comment, *Patronage Dismissals and Compelling State Interests: Can the Policymaking/Nonpolicymaking Distinction Withstand Scrutiny*, S. ILL. U. L.J. 278, 285 (1978). Moreover, requiring the elected official to retain an employee in a confidential or reliance post until covert action occurs is inconsistent with the principle on dismissing policymakers. "If a standard is to be established, it would seem that one in a confidential position should be no less subject to patronage dismissal than one in a policymaking position: in either case dismissal may be deemed necessary to insure 'that representative

---

"recognition of a legally cognizable distinction between 'bureaucratic' employees and those government workers in less structured," or more intimate, work settings. *Meeks*, 779 F.2d at 423.

government not be undercut by tactics obstructing the implementation of policies of the new administration.'" *Stegmaier*, 597 F.2d at 1039.

The undisputed evidence establishes that McReynolds and Martin were political rivals, that the Commission qualifies as a small office, and that McReynolds occupied a position of reliance and trust within the office. These facts are enough to show that, as a matter of law, political affiliation is a valid requirement for the Commission employee. Martin's motion for summary judgment in his favor is therefore granted. Accordingly, there is no need to address his qualified immunity defense.

### III. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment [15] is granted in its entirety. This case is terminated and the parties shall bear their own costs.

Entered this 14th day of August, 2007.

**s\Harold A. Baker**

_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE